UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTATE OF JOSEPH ROMAIN, | No. 08-cv-6981 |
| Plaintiff, | **"ECF Case"** |
| v. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| G. KENNEDY THOMPSON, RUTH G. SHAW, PETER C. BROWNING, ROBERT A. INGRAM, MACKEY J. MCDONALD, TIMOTHY D. PROCTOR, JOHN D. BAKER II, JOHN T. CASTEEN III, JEROME A. GITT, WILLIAM H. GOODWIN JR., MARYELLEN C. HERRINGER, DONALD M. JAMES, JOSEPH NEUBAUER, ERNEST S. RADY, VAN L. RICHEY,  LANTY L. SMITH and DONA DAVIS YOUNG, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| WACHOVIA CORPORATION, a North Carolina Corporation, | |
| Nominal Defendant. | |

Plaintiff, by its counsel, submits this Verified Shareholder Derivative Complaint against

Defendants herein.  All allegations made in this Complaint are based on information and belief,

except those allegations that pertain to the named Plaintiff, which are based on personal knowledge.

## SUMMARY

1.      This is a shareholder's derivative lawsuit against current and/or former members of

the Board of Directors ("Defendants") of  Wachovia Corporation (the "Company") arising out of

Defendants' violations of federal and state law, including the falsification of financials involving the

Company's performance, financial condition and prospects, the legal consequences resulting therefrom, and the resulting damage such acts have caused Wachovia. This action is brought by a shareholder of Wachovia, *on behalf of* Wachovia, seeking to recover for Wachovia and its shareholders the damages caused by, *inter alia*, Defendants' breaches of fiduciary duty during the period May 9, 2006 through the present (the "Relevant Period").

2.  Plaintiff alleges that during the Relevant Period Defendants knew or recklessly disregarded material adverse facts concerning Wachovia's business operations and prospects, including, among other things: (a) that the Company's acquisition of Golden West Financial Corporation ("Golden West") exposed the Company to tremendous losses from the meltdown of the subprime mortgage market; (b) that the Company had failed to adequately and timely record accruals for losses from its exposure to delinquent subprime mortgages; (c) that the Company had far greater exposure than previously disclosed to anticipated losses and defaults in its home loan portfolio; and (d) as a consequence of the foregoing, the Company's stock price was artificially inflated during the relevant Period.

3.  Defendants breached their fiduciary obligations to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Because Wachovia's directors will not authorize a lawsuit against themselves, Plaintiff brings this action on behalf of Wachovia, to, among other things, recover the damages caused by Defendants' malfeasance.

4.  Defendants' misconduct has cost the Company thousands of dollars in investigating violations of federal securities laws in at least two securities fraud class actions which have been filed against the Company. This class action case will cost Wachovia millions of dollars more to

defend and satisfy, and is directly related to Defendants' breaches of the fiduciary duties they each owe to the Company.

## PARTIES

5.      Joseph Romain or his Estate, by and through its trustees Robert Romain and Cynthia Flory, was at all times relevant hereto, a shareholder of Nominal Defendant Wachovia.  Plaintiff brings this action derivatively, on behalf of, and for the benefit of, Wachovia.

6.      Nominal Defendant Wachovia is a North Carolina corporation with its principal executive offices located at One Wachovia Center, Charlotte, North Carolina 28288-0013. Wachovia also has numerous offices and branches in New York, New York, including its "New York International Branch." The Company provides a wide range of commercial and retail banking and trust services through full-service banking offices throughout the nation. Through its subsidiaries, Wachovia provides various other financial services, including mortgage banking, investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, international and securities brokerage services. Wachovia stock is traded on the New York Stock Exchange.

7.      Defendant G. Kennedy Thompson ("Thompson") was Chairman of the Board of Wachovia until May 8, 2008. He also served as the Company's CEO, President and a director until June 1, 2008, when he retired those positions at the request of the board. Because of his positions, Thompson knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at

management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

8.     Defendant Ruth G. Shaw ("Shaw") has served as a director of the Company since 1990 and is the chairman of the Compensation & Management Resources Committee and a member of the Nominating & Corporate Governance Committee.  Because of her position, Shaw knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to her in connection therewith.

9.     Defendant Peter C. Browning ("Browning") has served as a director of the Company since 2001 and is a member of the Management Resources & Compensation Committee, the Corporate Governance & Nominating Committee, and the Executive Committee.  Because of his position, Browning knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

10.    Defendant Robert A. Ingram ("Ingram") has served as a director of the Company since 2001 and is the chairman of the Corporate Governance & Nominating Committee, and a

member of the Management Resources & Compensation Committee and Executive Committee. Because of his position, Ingram knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

11.     Defendant Mackey J. McDonald ("McDonald") has served as a director of the Company since 1997 and is a member of the Compensation & Management Resources Committee and the Corporate Governance & Nominating Committee. Because of his position, McDonald knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

12.     Defendant Timothy D. Proctor ("Proctor") has served as a director of the Company since 2006 and is a member of the Management Resources & Compensation Committee. Because of his position, Proctor knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees,

attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

13.    Defendant John D. Baker, II ("Baker") has served as a director of the Company since 2001 and is a member of the Audit Committee.  Because of his position, Baker knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

14.    Defendant John T. Casteen, III ("Casteen") has served as a director of the Company since 2001 and is a member of the Audit Committee. Because of his position, Casteen knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

15.    Defendant Jerome A. Gitt ("Gitt") has served as a director of the Company since 2006 and is a member of the Audit Committee.  Because of his position, Gitt knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans,

budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

16.    Defendant William H. Goodwin, Jr. ("Goodwin")  has served as a director of the Company since 1993 and is a member of the Executive Committee, the Nominating & Corporate Governance Committee and the Risk Committee.  Because of his position, Goodwin knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

17.    Defendant Maryellen C. Herringer ("Herringer") has served as a director of the Company since 2006 and is a member of the Risk Committee. Because of her position, Herringer knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to her in connection therewith.

18.    Defendant Donald M. James ("James") has served as a director of the Company since

2004 and is a member of the Risk Committee. Because of his position, James knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

19. Defendant Joseph Neubauer ("Neubauer") has served as a director of the Company since 1996 and is chairman of the Audit Committee and a member of the Executive Committee and the Corporate Governance & Nominating Committee. Because of his position, Neubauer knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

20. Defendant Ernest S. Rady ("Rady") has served as a director of the Company since 2006 and is a member of the Risk Committee. Because of his position, Rady knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of

Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

21.    Defendant Van L. Richey ("Richey") has served as a director of the Company since 2004 and is a member of the Risk Committee.  Because of his position, Richey knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

22.    Defendant Lanty L. Smith ("Smith") is Chairman of the Board of Directors since May 2008, when he replaced Defendant Thompson.  He also served as interim CEO from June 1, 2008 through July 9, 2008.  He has served as a director of the Company since 1987.  He is chairman of the Executive Committee, and is a member of the Audit Committee and the Corporate Governance & Nominating Committee.  Because of his position, Smith knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

23.    Defendant Dona Davis Young ("Young") has served as a director of the Company since 2001 and is a member of the Executive Committee and chairman of the Risk Committee.

Because of her position, Young knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to her in connection therewith.

24.    All Defendants described in ¶¶7-23, above, are collectively referred to hereinafter as the "Defendants."  All the Defendants, with the exception of Defendant Thompson, are members of the "Current Board."

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the Plaintiff and each Defendant, and the amount in controversy exceeds $75,000.

26.    Wachovia maintains significant operations and has dozens of branches in New York, New York, including its "New York International Branch" at 375 Park Avenue, New York, New York.  Moreover, Wachovia stock is traded on the New York Stock Exchange.  Exercising jurisdiction over the named Defendant directors of Wachovia is reasonable.

27.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because Wachovia maintains numerous branches in this District, and Defendants have received substantial compensation by doing business here and engaging in numerous activities that had an effect in this District.  Furthermore, this derivative action is related to, and arises from the same course of conduct as, a federal securities action filed in this District, *Lipetz v. Wachovia Corp. et al.* 1:08-cv-06171-

RJS.

## DUTIES OF THE DEFENDANTS

28.     By reason of their positions as officers, directors, and/or fiduciaries of Wachovia and because of their ability to control the business and corporate affairs of Wachovia, Defendants owed Wachovia and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Wachovia in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Wachovia and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Wachovia and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     Defendants, because of their positions of control and authority as directors and/or officers of Wachovia, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

30.     To discharge their duties, the officers and directors of Wachovia were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Wachovia were required to, among other things: (i) ensure that the affairs of Wachovia were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; (ii)  exercise good faith in supervising the preparation and filing

of all audits, reports, and other financial information required by law, including periodic financial statements and reports filed with the Securities and Exchange Commission ("SEC"), and in examining and evaluating such audits, reports, and other information concerning the financial affairs of the Company; and (iii) ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public.

31.     As alleged in detail below, Defendants breached their fiduciary duties of loyalty, good faith, and due care by causing or allowing the Company to engage in a series of illegal and imprudent practices whereby Wachovia unlawfully misrepresented the Company's financial condition in order to inflate the Company's operating performance, which have caused the Company to suffer enormous damages.

32.     Wachovia, the nation's fourth largest bank, is registered as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956, as amended. Wachovia provides a wide range of commercial and retail banking and trust services through full-service banking offices throughout the nation.  Through its subsidiaries, Wachovia provides various other financial services, including mortgage banking, investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, international and securities brokerage services.

33.     Throughout the Relevant Period, Defendants knew or should have known that the Company's stock was artificially inflated, due to the Company's mammoth involvement in the securitized subprime mortgage market.

12

34.     Subprime mortgage lending is defined as the practice of issuing high-interest or variable interest rate loans to customers with impaired or non-existing credit histories, who otherwise would not qualify for loans from mainstream lenders.

35.     Typically, subprime borrowers have relatively low credit scores, alone or in combination with an inability to adequately document income, and little or no money to apply to a down payment on a home.  These individuals would usually be excluded from the mortgage market and, accordingly, would not have mortgages included in the secondary market.

36.     According to an article titled "Subprime Loan Market Grows Despite Troubles," published December 7, 2004 in *USAToday*, subprime mortgage lenders "offer products from fixed-rate mortgages to interest-only loans, where borrowers pay just the interest for a set number of years, or "80-20" loans, in which borrowers finance a home with an 80% mortgage at one rate and the remaining 20% through a second loan."

37.     Subprime mortgage loans represent a greater risk to lenders than prime mortgage loans.  For example, one product marketed by some subprime lenders is a "Pay Option ARM," which is an adjustable rate mortgage with an interest rate that changes monthly and payments that change annually.  The borrower can choose from a variety of payment options; one option allows the borrower to pay less than the currently accrued interest, resulting in negative amortization. Thus, under this option the unpaid interest is added to the loan's principal.  Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed since the loan was made.  In both cases, the loan will become fully amortizing (meaning interest and principal payments will be made like a traditional mortgage).  The reversion to full amortization is referred to as a "reset" or "recast" and can result in a

substantial increase in a borrower's monthly mortgage payment.  If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

38.    Another product marketed by many subprime lenders is the 2/28 ARM – an adjustable rate mortgage with a fixed rate for two years, which then resets to an ARM rate index value (*e.g.*, the Treasury Bill rate or the London Inter-Bank Offering Rate (LIBOR)) plus a "margin" ("fixed percentage points above the "index " rate) for the rest of the loan term.  For example if the rate is 5% for two years but after two years, the index is 4% and the margin is 4.5%, a 5% loan becomes an 8.5% loan.  As with Pay Option ARMs, 2/28 ARM borrowers who are unable to refinance their loans and obtain a more favorable arrangement, they may be in a position where they cannot meet their new mortgage payment once their fixed mortgage loan resets.

39.    Rather than hold and service the loans for their entire term, mortgage lenders typically sell their subprime mortgages, which are bundled into bonds and offered to individual and institutional investors.  Wachovia publicly expressed interest in subprime mortgage lenders in Spring 2006 when Defendant Thompson expressed optimism about the "transformative" nature of Wachovia's acquisition of Golden West Financial Corporation, in a *Bloomberg.com* article published April 15, 2008, titled "Wachovia's Lead Director Says Board Backs Thompson."  The article further stated, in relevant part:

> Wachovia Corp. Chief Executive Officer Kennedy Thompson said in May 2006 that it would take "huge unemployment and a huge downdraft in home values" for the bank's acquisition of Golden West Financial Corp. to flop.
>
> Two years later, the $24.6 billion takeover of Oakland, California-based Golden West is the biggest cause for the fourth- largest U.S. bank losing half its market valuation, cutting its dividend by 41 percent and selling $7 billion of stock to boost its capital in the face of likely further credit losses.

14

Wachovia's board remains strongly committed to Thompson's team, lead independent director Lanty Smith, 57, said in an interview yesterday. Learning from the Golden West experience, Wachovia's board ``is going to be extra cautious in any future acquisitions,'' said Smith, a board member since 1987.

``What they missed was that prices had to come down in California and when that happened, it was going to cause all kinds of economic havoc,'' said Christopher Thornberg, founding partner of Los Angeles-based research and consulting firm Beacon Economics LLC.

Wachovia fell 13 cents to $25.42 at 4:15 p.m. in New York Stock Exchange composite trading after slumping 8.1 percent yesterday. The stock fell 33 percent this year to date.

Analysts' Cuts

Two analysts today reduced their profit predictions for Wachovia. Meredith Whitney of Oppenheimer & Co. cut her fiscal 2008 earnings estimate to $1.70 a share from $2.70. She cited subprime credit losses and the share sale, which diluted existing stock by 15 percent. Michael Mayo of Deutsche Bank reduced his estimates to $2 from $2.80 for this year and to $2.90 from $3.90 for 2009. Mayo also cut the share price estimate for the bank by 17 percent to $29.

Thompson, 57, said yesterday he was ``deeply disappointed'' by the Charlotte, North Carolina-based company's first quarterly loss since 2001. The $393 million loss, or 20 cents a share, was worse than the 40-cent profit predicted by analysts. The housing decline is half over with further credit losses ahead, Chief Risk Officer Donald Truslow said.

Wachovia raised more than $7 billion yesterday by selling common and preferred shares, mainly to its largest investors, Smith said.

``The good news is that the marketplace still has a lot of confidence in our franchise,'' said Smith, a former textile industry executive who's president of Tippet Capital LLC, an investment and merchant banking firm in Raleigh, North Carolina.

Thompson 'Capable'

Thompson's position as CEO seems secure partly because so many other financial services executives are facing difficulties, Jason Goldberg, an analyst at Lehman Brothers Holdings Inc., said in a Bloomberg TV interview. He has an ``overweight'' rating on Wachovia.

15

``Thompson is capable of weathering this storm'' Goldberg said. ``We don't know anyone else who is better than him to get through this.''

Thompson was initially optimistic about the ``transformative'' nature of the Golden West deal. The bank studied Golden West's successful 43-year history through California's cyclical housing economy, and concluded that its model of underwriting and then holding adjustable-rate loans with flexible terms, rather than selling them to secondary investors, was convincing, he said.

``Maybe Golden West was the best of the irrational lenders in the West Coast lending model, but it was bad money nonetheless,'' said David Hendler, a New York-based analyst at CreditSights Inc.

Mortgage Defaults

Wachovia now expects as much as 8 percent of its $120 billion in so-called option adjustable-rate mortgages to default over the life of the loans. The bank's previous estimate was for losses of less than half that. Even that may be optimistic, said Beacon's Thornberg, a lecturer in economics at the University of California at Los Angeles.

``California real estate remains in total free fall with foreclosures accelerating at a phenomenal rate in the past two quarters,'' he said. ``The real pain is just starting to come out right now, though it was imminently predictable a year ago.''

Wachovia's nonperforming assets, for which it doesn't collect interest, totaled 1.7 percent as of March 31. ``In the 1990 recession, NPAs got to 3.1 percent, so if Wachovia is one of the companies worst hit in this cycle, their nonperforming assets could more than double from here,'' said James Ellman, president of San Francisco-based Seacliff Capital LLC, which manages about $200 million.

Aside from home lending, Thompson is scaling back Wachovia's corporate and investment bank as demand for packages of home loans and other complex securities shows no sign of rebounding. Wachovia is cutting 500 jobs in the unit, bringing to more than 1,000 the number of positions eliminated since early 2007. The bank said it had 121,890 employees as of Dec. 31, 2007.

40.     As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans. This often had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans. In other words, many lenders became less concerned with borrowers' ability to repay over the long term and

more concerned with their mere volume of loans over the short term because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay. Consequently, as home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for these mortgages rose as well. For example, in an article titled "Tremors at the Door," published January 26, 2007 in *The New York Times*, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5% in 2006.

41.     The substantial increase in mortgage loan defaults has had a tremendous impact on the mortgage market. During the first half of 2007, many lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

42.     Although most investment banks recognized warning signs and reduced their exposure, Wachovia inexplicably chose to *increase* its entrenchment in the subprime mortgage market. On May 7, 2006, Wachovia and Golden West announced that they had entered into an Agreement and Plan of Merger, which provides, among other things, for Golden West to be merged with and into a wholly-owned subsidiary of Wachovia (the "Merger"). Wachovia acquired Golden West for $25.5 billion, a company which had substantial exposure to losses related to problems within the subprime mortgage industry.

43.     Together with its acquisition of Golden West, Wachovia itself became exposed to substantial losses, as the subprime mortgage industry suffered an immense collapse. Nonetheless, Defendants repeatedly caused to be issued inaccurate, incomplete and materially misleading statements concerning the Company's financial condition.

44.     Defendants knew or should have known that Wachovia's stock was artificially

17

inflated, due to: (a) the fact that the Company's acquisition of Golden West exposed the Company to tremendous losses from the meltdown of the subprime mortgage market; (b) the fact that the Company had failed to adequately and timely record accruals for losses from its exposure to delinquent subprime mortgages; and (c) the fact that the Company had far greater exposure than previously disclosed to anticipated losses and defaults in its home loan portfolio.

45.    By virtue of their positions and directors of the board of the Company, Defendants knew or should have known of the existence of the above-mentioned problems.  Indeed,  an article titled "Wachovia sees deal as fortification," published in *USAToday* on May 9, 2006 – two days after the acquisition of Golden West was announced – noted analysts' misgivings about the risks inherent in the deal:

> Wachovia (WB), the nation's fourth-largest bank by assets, is touting its $25.5 billion purchase of Golden West Financial (GDW) as a low-risk, high-growth strategy to expand its retail banking footprint to 21 states and mortgage-lending operations to 39 states.
>
> Some analysts and investors, though, aren't quite sold on the deal's merits. At least two analysts downgraded Wachovia's stock Monday, and investors pushed the shares down 6.7% to $55.42.
>
> The acquisition of the mortgage lender comes at a time when many real estate markets in the USA have cooled. With housing prices softening and interest rates rising, mortgage lenders such as Golden West may be at risk for losses.
>
> Over the past few years, consumers have flocked to adjustable-rate mortgages — Golden West's core business — whose rates rise with interest rates. But mortgage applications have slowed in recent months.
>
> Meanwhile, the risk of default is increasing. "Whether (the deal) is a success for Wachovia or not is going to be pretty strongly tied to what happens to the California housing market," says Brian Shullaw, a senior analyst at SNL Financial. "If default rates go up, then that's not going to be good for Wachovia."

But Wachovia sees the deal as a way to strengthen and diversify its business, especially outside the East and South. Wachovia would control about $669 billion in assets and $390 billion in deposits. It will rank third in market share behind JPMorgan Chase and Bank of America, says Prudential analyst Michael Mayo.

The deal is "very, very attractive" because it will allow the company to expand into high-growth areas in the West, says Ben Jenkins, Wachovia's vice chairman.

The cash-and-stock deal — expected to close in the fourth quarter — values Golden West at $81.07 a share, a 15% premium over Friday's closing price. Wachovia is exchanging 1.051 shares of its common stock and $18.65 in cash for each Golden West share.

Wachovia has bank branches in 16 states. The acquisition will broaden its presence in California, where World Savings Bank, a subsidiary of Golden West, has 123 branches and $32 billion in deposits. Wachovia will also gain its first bank branches in Arizona, Colorado, Illinois, Kansas and Nevada.

Because there's little overlap in the companies' business, Wachovia doesn't expect deep cost savings. It expects to close 55 branches and shed 1,100 employees, much of it through attrition, Jenkins says. That would leave a combined staff of 109,000 workers.

Jenkins says he's not too concerned about whether a weaker housing market will pose a risk to Wachovia, because "We are very persnickety about who we team up with." Also, Golden West has a "tight underwriting process," Jenkins says.

But the acquisition faces other challenges besides a slowing housing market. "Essentially, the concern is the integration of two very dissimilar firms" — a commercial bank and a thrift known for its mortgage-lending operations, says analyst Gary Townsend of Friedman Billings Ramsey. Townsend downgraded Wachovia's stock to a market perform, from market outperform. "We're not in love with this deal," he says.

Mayo, of Prudential, also downgraded Wachovia's stock, noting that the purchase price was "not cheap."

The deal is the latest for Wachovia. Earlier this year, it announced

19

that it would buy Emigrant Bank's American Property Financing and the retirement-plan administration business of Ameriprise Financial.

46.     Defendants knew or should have known that the Company's substantial exposure to subprime mortgage-related losses would impact the Company's stock price were the truth to became known.  For example, an article titled "Wachovia's Big Mortgage Buy," published February 20, 2008 in *Fortune*, noted that "Golden West's loans, option ARMs clustered in the frothy California real estate market, may take a hit from the housing downturn."  The article further noted the downside potential of the deal, stating in part:

> The street has never much cared for Wachovia's 2006 purchase of Golden West Financial for $24 billion. Even before the mortgage industry went splat, skeptics felt Wachovia CEO Ken Thompson was paying too much for Golden West's abundance of pay-option adjustable-rate mortgages, or option ARMs, clustered in the frothy California real estate market. Still, Herb and Marion Sandler, the husband and wife team behind Golden West, were legendary for their rigorous underwriting standards and had nimbly steered their S&L through the ugly California real estate downturn in the early '90s when other banks failed to. Now analysts and investors are wondering: Can Thompson pull off the same feat today, or is the bank in for some trouble?

47.     During the Relevant Period, the Company concealed, distorted and misrepresented its true financial condition.

48.     Indeed, Wachovia's November 8, 2007, disclosure of the Company's actual exposure to subprime mortgage-related losses was confirmed when the Company announced that it was setting aside $600 million in the fourth quarter and announced that securities linked to subprime mortgages dropped by $1.1 billion in October 2007.  This followed write-downs of $1.3 billion dollars in the third quarter.  In its press release, Wachovia stated:

> Wachovia Corporation ("Wachovia") today is providing information on the impact of market volatility on its financial results for the month of October and is providing further information on its expectation for credit costs for the fourth quarter of 2007 and certain additional information. Wachovia is providing this information in

advance of a presentation by a senior executive on November 9, 2007 to investors and analysts. This same information will be included in Wachovia's Third Quarter Report on Form 10-Q that will be filed on November 9, 2007:

**October Market Events** Following our October 2007 announcement of third quarter 2007 results of operations and our financial outlook for the remainder of 2007, certain financial markets experienced further deterioration, particularly the markets for subprime residential mortgage-backed securities ("RMBS") and for collateralized debt obligations ("CDOs") collateralized by RMBS ("ABS CDOs"). In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

\* \* \*

The value of CDOs we have in our portfolio depends on the value of the underlying collateral. ABS CDOs experienced declines in value correlated to the declines in value of subprime RMBS in October. Our third quarter 2007 market disruption-related losses totaling $1.3 billion pre-tax included $347 million of subprime-related valuation losses, net of hedges, on ABS CDOs. Due to the October market deterioration, these ABS CDOs experienced further declines in value in the month of October 2007 by an amount we currently estimate to be approximately $1.1 billion pre-tax. At October 31, 2007, we had remaining exposure to ABS CDOs of $676 million, including on-balance sheet positions and the notional amount of off-balance sheet positions, compared to $1.8 billion at September 30, 2007.

We have exposure to subprime RMBS in other positions totaling $2.1 billion at both October 31, 2007, and September 30, 2007. Estimated aggregate valuation losses of these other positions during the month of October 2007 are immaterial net of hedges.

\* \* \*

Of the remaining asset classes where we recorded market disruption-related losses in the third quarter of 2007, the aggregate net market value changes in October in these investments have not been significant. These asset classes include commercial mortgage,

21

leveraged finance, consumer mortgage, and other structured credit products not collateralized by subprime RMBS. Some of the markets for these asset classes continue to demonstrate poor liquidity and higher than typical volatility while others have displayed moderate stability in October.

The fair values of all of our assets that are subject to market valuation adjustments, including subprime RMBS and ABS CDOs, depend on market conditions and assumptions that may change over time. Accordingly, the fair values of these investments in future periods, including at the end of the fourth quarter, and their effect on our financial results, will depend on future market developments and assumptions and may be materially greater or less than the changes in values during October discussed above. For example, markets for all asset classes discussed above have remained extraordinarily volatile in the first week of November, with additional rating agencies' downgrades on subprime RMBS and ABS CDOs, and credit spread widening and illiquidity.

Wachovia has historically been a major participant in structuring and underwriting CDOs. As measured by lead underwriter league table rankings, Wachovia ranked 3rd for both the first nine months of 2007 and the full year 2006, with issuance volumes of $19.6 billion and $23.4 billion, respectively. The primary focus of Wachovia's CDO business has been, and continues to be, transactions backed by commercial loans and commercial real estate loans. Our issuance of ABS CDOs has been limited. We originated three ABS CDOs in the first nine months of 2007 and six in full year 2006, accounting for approximately 16 percent and 23 percent, respectively, of the total issuance volume of our CDO business during these periods.

Additionally, due to anticipated loan growth and the impact of continuing credit deterioration in our loan portfolio, we expect to increase our allowance for loan losses in the fourth quarter of 2007. The expected credit deterioration will likely be focused in certain geographic areas that have recently experienced dramatic declines in housing values. We expect that these declines will correlate to increases in loan losses for loans originated within the last two years within these geographic areas. Accordingly, Wachovia now expects to record a loan loss provision in the fourth quarter of 2007 by an amount estimated to be between $500 million and $600 million in excess of charge-offs for the quarter. The actual provision will be determined in accordance with our policies and procedures, will depend on credit conditions and assumptions at quarter-end and may

22

be materially greater or less than the range discussed in the preceding sentence.

49. The *Associated Press* reported on November 9, 2007 that "[p]er Golden West, it now becomes even more obvious that Wachovia purchased the thrift at the wrong time of the cycle. ... The weakening markets - which Wachovia estimates could get worse over the last two months of the quarter - cut the value of the bank's so-called collateralized debt obligations by more than 60 percent."

50. However, even as late as October 2007, Wachovia continued to foster a positive attitude regarding its acquisition of Golden West. On October 19, 2007, Wachovia issued a press release, announcing "Wachovia anticipates that the Golden West merger will provide Wachovia with financial benefits that include increased revenue and reduced operating expenses, but these financial benefits are not reflected in the combined illustrative information. Accordingly, the combined illustrative information does not attempt to predict or suggest future results. It also does not necessarily reflect what the historical results of the combined company would have been had our companies been combined during the periods presented."

51. As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market risks that Defendants made to the market regarding Wachovia's condition did not effectively inform the investors of the past, immediate, and future dangers Wachovia was facing.

52. An adequate investigation by Defendants would have revealed the Company's substantial, undisclosed exposure to subprime mortgage-related losses. A reasonably prudent fiduciary acting under similar circumstances would have acted to protect the Company against

unnecessary losses.

53.    Because Defendants knew or should have known that Wachovia was not as healthy as represented, they had an obligation to protect the Company from unreasonable and entirely predictable losses incurred as a result of the Company's subprime exposure.

54.    Upon information and belief, Wachovia and certain other Defendants regularly communicated with shareholders about the performance, future financial and business prospects of the Company.  During the Relevant Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, by not disclosing negative material information concerning investment in the Company's stock.  As such, investors could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments.

55.    Relevant SEC filings and related Company statements and releases issued during the Relevant Period were inaccurate, incomplete and materially misleading, causing Wachovia stock to be artificially inflated.  These statements, their related press releases, and substantially similar SEC filings and press releases issued during the Relevant Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the market of the Company's ever-increasing problems with its key product lines, including loan defaults, liquidity concerns and shrinking demand.  These statements were made with the implicit knowledge that the market would rely upon such information in determining whether to purchase or maintain investments in Wachovia stock.

## THE DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

56.    Through their positions as directors and/or officers of the Company and their receipt

24

of reports, attendance at meetings, and access to all of the Company's books, records and other proprietary information, each of the Defendants knew that Wachovia had engaged in the unlawful and imprudent conduct described herein.

57.    Each of the Defendants breached their fiduciary duties of loyalty, good faith, and due care by knowingly causing or allowing the Company to engage in the unlawful and imprudent conduct described herein.

58.    As a direct and proximate result of Defendants' breaches of fiduciary duties, Wachovia has suffered enormous damages, including, but not limited to, damages associated with numerous lawsuits and investigations of the Company, as alleged herein.

## DERIVATIVE ALLEGATIONS

59.    Plaintiff brings this action derivatively in the right and for the benefit of Wachovia, to redress injuries suffered and to be suffered by the Company as a direct result of the violations of law, breaches of fiduciary duty and other wrongdoing described in this complaint, committed by Defendants and alleged in detail herein.  Wachovia is named as a nominal defendant solely in a derivative capacity.

60.    Plaintiff will adequately and fairly represent the interests of Wachovia and its shareholders in enforcing and prosecuting their rights.

61.    Wachovia's Board of Directors is currently composed of sixteen directors – Defendants Shaw, Browning, Ingram, McDonald, Proctor, Baker, Casteen, Gitt, Goodwin, Herringer, James, Neubauer, Rady, Richey, Smith and Young (the "Current Board").  Each of these directors has been named as a defendant in this action.

62.    The Current Board owed a duty to Wachovia and its shareholders to be reasonably

informed about the business and operations of the Company. The Current Board completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

63.    Demand on the Current Board to institute this action is would be a futile and useless act, for the additional following reasons:

a.    Members of the Current Board participated in, approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from Wachovia stockholders and investors and are, therefore, not disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

b.    Members of the Current Board had a responsibility and obligation to assure that all press releases and filings, including all financial reports, were accurate and that all internal controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

c.    In order to bring this suit, members of the Current Board would be forced to sue themselves and/or persons with whom they have extensive business and/or personal entanglements, which they will not do;

d.    The acts complained herein of constitute violations of federal and state law and the fiduciary duties owed by members of the Current Board and are incapable of ratification;

e.    Certain members of the Current Board herein are currently defendants in a

securities class action lawsuit arising out of the wrongdoing alleged herein and a suit by them to remedy the wrongs alleged herein would likely expose them to liability in the securities class action; thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves and the other Defendants;

f.    The actions of Defendants have impaired the Current Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

g.    The misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment;

h.    Wachovia has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Current Board has not filed any lawsuits against themselves or others who were responsible for that wrongful course of conduct, nor have they attempted to recover any part of the damages Wachovia suffered and will suffer thereby; and

i.    Accordingly, members of the Current Board are personally and directly conflicted and committed to the unlawful course of conduct in dispute and, therefore, cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

64.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

27

65.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

66.     Defendants each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

67.     Each of the Defendants authorized, or by abdication of duty, each of the Defendants participated in, approved or recklessly disregarded the wrongs complained of herein.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

68.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to the Company's reputation, business and good will.

69.     The Company has been directly and substantially injured by reason of Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Awarding to Plaintiff the costs and disbursements of the action, including

28

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

      C.    Awarding punitive damages against Defendants, jointly and severally, to be determined at trial, together with prejudgment interest at the maximum rate allowable by law; and

      D.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by jury.

Dated: August 5, 2008                    **MURRAY, FRANK & SAILER LLP**

                                    S\\
                ——————————————————————
                Brian P. Murray (BM 9954)
                Gregory B. Linkh (GL 0477)
                275 Madison Avenue, Suite 801
                New York, New York 10016
                Telephone: (212) 682-1818
                Facsimile: (212) 682-1892

Howard G. Smith
**LAW OFFICES OF HOWARD G. SMITH**
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

**Plaintiff's Counsel**

**VERIFICATION**

We, Robert Romain and Cynthia Flory, as trustees of the Estate of Joseph Romain, on behalf of the Estate of Joseph Romain, hereby declare as follows:

The Estate of Joseph Romain is the Plaintiff in the above captioned case. We have read the foregoing Derivative Action Complaint and authorized its filing. Based upon the investigation of our counsel, the allegations in the Complaint are true to the best of our knowledge, information and belief.

7/29/08
Dated

Robert Romain

7/29/08
Dated

Cynthia Flory

UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTATE OF JOSEPH ROMAIN, | No. 08-cv-6981 |
| Plaintiff, | **"ECF Case"** |
| v. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| G. KENNEDY THOMPSON, RUTH G. SHAW, PETER C. BROWNING, ROBERT A. INGRAM, MACKEY J. MCDONALD, TIMOTHY D. PROCTOR, JOHN D. BAKER II, JOHN T. CASTEEN III, JEROME A. GITT, WILLIAM H. GOODWIN JR., MARYELLEN C. HERRINGER, DONALD M. JAMES, JOSEPH NEUBAUER, ERNEST S. RADY, VAN L. RICHEY,  LANTY L. SMITH and DONA DAVIS YOUNG, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| WACHOVIA CORPORATION, a North Carolina Corporation, | |
| Nominal Defendant. | |

Plaintiff, by its counsel, submits this Verified Shareholder Derivative Complaint against

Defendants herein.  All allegations made in this Complaint are based on information and belief,

except those allegations that pertain to the named Plaintiff, which are based on personal knowledge.

**SUMMARY**

1.      This is a shareholder's derivative lawsuit against current and/or former members of

the Board of Directors ("Defendants") of  Wachovia Corporation (the "Company") arising out of

Defendants' violations of federal and state law, including the falsification of financials involving the

Company's performance, financial condition and prospects, the legal consequences resulting therefrom, and the resulting damage such acts have caused Wachovia. This action is brought by a shareholder of Wachovia, *on behalf of* Wachovia, seeking to recover for Wachovia and its shareholders the damages caused by, *inter alia*, Defendants' breaches of fiduciary duty during the period May 9, 2006 through the present (the "Relevant Period").

2.     Plaintiff alleges that during the Relevant Period Defendants knew or recklessly disregarded material adverse facts concerning Wachovia's business operations and prospects, including, among other things: (a) that the Company's acquisition of Golden West Financial Corporation ("Golden West") exposed the Company to tremendous losses from the meltdown of the subprime mortgage market; (b) that the Company had failed to adequately and timely record accruals for losses from its exposure to delinquent subprime mortgages; (c) that the Company had far greater exposure than previously disclosed to anticipated losses and defaults in its home loan portfolio; and (d) as a consequence of the foregoing, the Company's stock price was artificially inflated during the relevant Period.

3.     Defendants breached their fiduciary obligations to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Because Wachovia's directors will not authorize a lawsuit against themselves, Plaintiff brings this action on behalf of Wachovia, to, among other things, recover the damages caused by Defendants' malfeasance.

4.     Defendants' misconduct has cost the Company thousands of dollars in investigating violations of federal securities laws in at least two securities fraud class actions which have been filed against the Company. This class action case will cost Wachovia millions of dollars more to

defend and satisfy, and is directly related to Defendants' breaches of the fiduciary duties they each owe to the Company.

## PARTIES

5.      Joseph Romain or his Estate, by and through its trustees Robert Romain and Cynthia Flory, was at all times relevant hereto, a shareholder of Nominal Defendant Wachovia.  Plaintiff brings this action derivatively, on behalf of, and for the benefit of, Wachovia.

6.      Nominal Defendant Wachovia is a North Carolina corporation with its principal executive offices located at One Wachovia Center, Charlotte, North Carolina 28288-0013. Wachovia also has numerous offices and branches in New York, New York, including its "New York International Branch."  The Company provides a wide range of commercial and retail banking and trust services through full-service banking offices throughout the nation.  Through its subsidiaries, Wachovia provides various other financial services, including mortgage banking, investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, international and securities brokerage services. Wachovia stock is traded on the New York Stock Exchange.

7.      Defendant G. Kennedy Thompson ("Thompson") was Chairman of the Board of Wachovia until May 8, 2008.  He also served as the Company's CEO, President and a director until June 1, 2008, when he retired those positions at the request of the board.  Because of his positions, Thompson knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at

management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

8.    Defendant Ruth G. Shaw ("Shaw") has served as a director of the Company since 1990 and is the chairman of the Compensation & Management Resources Committee and a member of the Nominating & Corporate Governance Committee.  Because of her position, Shaw knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to her in connection therewith.

9.    Defendant Peter C. Browning ("Browning") has served as a director of the Company since 2001 and is a member of the Management Resources & Compensation Committee, the Corporate Governance & Nominating Committee, and the Executive Committee.  Because of his position, Browning knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

10.    Defendant Robert A. Ingram ("Ingram") has served as a director of the Company since 2001 and is the chairman of the Corporate Governance & Nominating Committee, and a

member of the Management Resources & Compensation Committee and Executive Committee. Because of his position, Ingram knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

11.     Defendant Mackey J. McDonald ("McDonald") has served as a director of the Company since 1997 and is a member of the Compensation & Management Resources Committee and the Corporate Governance & Nominating Committee. Because of his position, McDonald knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

12.     Defendant Timothy D. Proctor ("Proctor") has served as a director of the Company since 2006 and is a member of the Management Resources & Compensation Committee. Because of his position, Proctor knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees,

attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

13.     Defendant John D. Baker, II ("Baker") has served as a director of the Company since 2001 and is a member of the Audit Committee.  Because of his position, Baker knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

14.     Defendant John T. Casteen, III ("Casteen") has served as a director of the Company since 2001 and is a member of the Audit Committee. Because of his position, Casteen knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

15.     Defendant Jerome A. Gitt ("Gitt") has served as a director of the Company since 2006 and is a member of the Audit Committee.  Because of his position, Gitt knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans,

6

budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

16.    Defendant William H. Goodwin, Jr. ("Goodwin")  has served as a director of the Company since 1993 and is a member of the Executive Committee, the Nominating & Corporate Governance Committee and the Risk Committee.  Because of his position, Goodwin knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

17.    Defendant Maryellen C. Herringer ("Herringer") has served as a director of the Company since 2006 and is a member of the Risk Committee. Because of her position, Herringer knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to her in connection therewith.

18.    Defendant Donald M. James ("James") has served as a director of the Company since

7

2004 and is a member of the Risk Committee. Because of his position, James knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

19.    Defendant Joseph Neubauer ("Neubauer") has served as a director of the Company since 1996 and is chairman of the Audit Committee and a member of the Executive Committee and the Corporate Governance & Nominating Committee. Because of his position, Neubauer knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

20.    Defendant Ernest S. Rady ("Rady") has served as a director of the Company since 2006 and is a member of the Risk Committee. Because of his position, Rady knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of

8

Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

21.     Defendant Van L. Richey ("Richey") has served as a director of the Company since 2004 and is a member of the Risk Committee.  Because of his position, Richey knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

22.     Defendant Lanty L. Smith ("Smith") is Chairman of the Board of Directors since May 2008, when he replaced Defendant Thompson.  He also served as interim CEO from June 1, 2008 through July 9, 2008.  He has served as a director of the Company since 1987.  He is chairman of the Executive Committee, and is a member of the Audit Committee and the Corporate Governance & Nominating Committee.  Because of his position, Smith knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

23.     Defendant Dona Davis Young ("Young") has served as a director of the Company since 2001 and is a member of the Executive Committee and chairman of the Risk Committee.

Because of her position, Young knew the adverse non-public information about the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to her in connection therewith.

24.    All Defendants described in ¶¶7-23, above, are collectively referred to hereinafter as the "Defendants."  All the Defendants, with the exception of Defendant Thompson, are members of the "Current Board."

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the Plaintiff and each Defendant, and the amount in controversy exceeds $75,000.

26.    Wachovia maintains significant operations and has dozens of branches in New York, New York, including its "New York International Branch" at 375 Park Avenue, New York, New York.  Moreover, Wachovia stock is traded on the New York Stock Exchange.  Exercising jurisdiction over the named Defendant directors of Wachovia is reasonable.

27.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because Wachovia maintains numerous branches in this District, and Defendants have received substantial compensation by doing business here and engaging in numerous activities that had an effect in this District.  Furthermore, this derivative action is related to, and arises from the same course of conduct as, a federal securities action filed in this District, *Lipetz v. Wachovia Corp. et al.* 1:08-cv-06171-

RJS.

## DUTIES OF THE DEFENDANTS

28.    By reason of their positions as officers, directors, and/or fiduciaries of Wachovia and because of their ability to control the business and corporate affairs of Wachovia, Defendants owed Wachovia and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Wachovia in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Wachovia and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Wachovia and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.    Defendants, because of their positions of control and authority as directors and/or officers of Wachovia, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

30.    To discharge their duties, the officers and directors of Wachovia were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Wachovia were required to, among other things: (i) ensure that the affairs of Wachovia were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; (ii)  exercise good faith in supervising the preparation and filing

of all audits, reports, and other financial information required by law, including periodic financial statements and reports filed with the Securities and Exchange Commission ("SEC"), and in examining and evaluating such audits, reports, and other information concerning the financial affairs of the Company; and (iii) ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public.

31.     As alleged in detail below, Defendants breached their fiduciary duties of loyalty, good faith, and due care by causing or allowing the Company to engage in a series of illegal and imprudent practices whereby Wachovia unlawfully misrepresented the Company's financial condition in order to inflate the Company's operating performance, which have caused the Company to suffer enormous damages.

32.     Wachovia, the nation's fourth largest bank, is registered as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956, as amended. Wachovia provides a wide range of commercial and retail banking and trust services through full-service banking offices throughout the nation.  Through its subsidiaries, Wachovia provides various other financial services, including mortgage banking, investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, international and securities brokerage services.

33.     Throughout the Relevant Period, Defendants knew or should have known that the Company's stock was artificially inflated, due to the Company's mammoth involvement in the securitized subprime mortgage market.

34.     Subprime mortgage lending is defined as the practice of issuing high-interest or variable interest rate loans to customers with impaired or non-existing credit histories, who otherwise would not qualify for loans from mainstream lenders.

35.     Typically, subprime borrowers have relatively low credit scores, alone or in combination with an inability to adequately document income, and little or no money to apply to a down payment on a home.  These individuals would usually be excluded from the mortgage market and, accordingly, would not have mortgages included in the secondary market.

36.     According to an article titled "Subprime Loan Market Grows Despite Troubles," published December 7, 2004 in *USAToday*, subprime mortgage lenders "offer products from fixed-rate mortgages to interest-only loans, where borrowers pay just the interest for a set number of years, or "80-20" loans, in which borrowers finance a home with an 80% mortgage at one rate and the remaining 20% through a second loan."

37.     Subprime mortgage loans represent a greater risk to lenders than prime mortgage loans.  For example, one product marketed by some subprime lenders is a "Pay Option ARM," which is an adjustable rate mortgage with an interest rate that changes monthly and payments that change annually.  The borrower can choose from a variety of payment options; one option allows the borrower to pay less than the currently accrued interest, resulting in negative amortization. Thus, under this option the unpaid interest is added to the loan's principal.  Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed since the loan was made.  In both cases, the loan will become fully amortizing (meaning interest and principal payments will be made like a traditional mortgage). The reversion to full amortization is referred to as a "reset" or "recast" and can result in a

substantial increase in a borrower's monthly mortgage payment.  If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

38.    Another product marketed by many subprime lenders is the 2/28 ARM – an adjustable rate mortgage with a fixed rate for two years, which then resets to an ARM rate index value (*e.g.*, the Treasury Bill rate or the London Inter-Bank Offering Rate (LIBOR)) plus a "margin" ("fixed percentage points above the "index " rate) for the rest of the loan term.  For example if the rate is 5% for two years but after two years, the index is 4% and the margin is 4.5%, a 5% loan becomes an 8.5% loan.  As with Pay Option ARMs, 2/28 ARM borrowers who are unable to refinance their loans and obtain a more favorable arrangement, they may be in a position where they cannot meet their new mortgage payment once their fixed mortgage loan resets.

39.    Rather than hold and service the loans for their entire term, mortgage lenders typically sell their subprime mortgages, which are bundled into bonds and offered to individual and institutional investors.  Wachovia publicly expressed interest in subprime mortgage lenders in Spring 2006 when Defendant Thompson expressed optimism about the "transformative" nature of Wachovia's acquisition of Golden West Financial Corporation, in a *Bloomberg.com* article published April 15, 2008, titled "Wachovia's Lead Director Says Board Backs Thompson."  The article further stated, in relevant part:

> Wachovia Corp. Chief Executive Officer Kennedy Thompson said in May 2006 that it would take "huge unemployment and a huge downdraft in home values" for the bank's acquisition of Golden West Financial Corp. to flop.
>
> Two years later, the $24.6 billion takeover of Oakland, California-based Golden West is the biggest cause for the fourth- largest U.S. bank losing half its market valuation, cutting its dividend by 41 percent and selling $7 billion of stock to boost its capital in the face of likely further credit losses.

14

Wachovia's board remains strongly committed to Thompson's team, lead independent director Lanty Smith, 57, said in an interview yesterday. Learning from the Golden West experience, Wachovia's board ``is going to be extra cautious in any future acquisitions,'' said Smith, a board member since 1987.

``What they missed was that prices had to come down in California and when that happened, it was going to cause all kinds of economic havoc,'' said Christopher Thornberg, founding partner of Los Angeles-based research and consulting firm Beacon Economics LLC.

Wachovia fell 13 cents to $25.42 at 4:15 p.m. in New York Stock Exchange composite trading after slumping 8.1 percent yesterday. The stock fell 33 percent this year to date.

Analysts' Cuts

Two analysts today reduced their profit predictions for Wachovia. Meredith Whitney of Oppenheimer & Co. cut her fiscal 2008 earnings estimate to $1.70 a share from $2.70. She cited subprime credit losses and the share sale, which diluted existing stock by 15 percent. Michael Mayo of Deutsche Bank reduced his estimates to $2 from $2.80 for this year and to $2.90 from $3.90 for 2009. Mayo also cut the share price estimate for the bank by 17 percent to $29.

Thompson, 57, said yesterday he was ``deeply disappointed'' by the Charlotte, North Carolina-based company's first quarterly loss since 2001. The $393 million loss, or 20 cents a share, was worse than the 40-cent profit predicted by analysts. The housing decline is half over with further credit losses ahead, Chief Risk Officer Donald Truslow said.

Wachovia raised more than $7 billion yesterday by selling common and preferred shares, mainly to its largest investors, Smith said.

``The good news is that the marketplace still has a lot of confidence in our franchise,'' said Smith, a former textile industry executive who's president of Tippet Capital LLC, an investment and merchant banking firm in Raleigh, North Carolina.

Thompson 'Capable'

Thompson's position as CEO seems secure partly because so many other financial services executives are facing difficulties, Jason Goldberg, an analyst at Lehman Brothers Holdings Inc., said in a Bloomberg TV interview. He has an ``overweight'' rating on Wachovia.

``Thompson is capable of weathering this storm'' Goldberg said. ``We don't know anyone else who is better than him to get through this.''

Thompson was initially optimistic about the ``transformative'' nature of the Golden West deal. The bank studied Golden West's successful 43-year history through California's cyclical housing economy, and concluded that its model of underwriting and then holding adjustable-rate loans with flexible terms, rather than selling them to secondary investors, was convincing, he said.

``Maybe Golden West was the best of the irrational lenders in the West Coast lending model, but it was bad money nonetheless,'' said David Hendler, a New York-based analyst at CreditSights Inc.

Mortgage Defaults

Wachovia now expects as much as 8 percent of its $120 billion in so-called option adjustable-rate mortgages to default over the life of the loans. The bank's previous estimate was for losses of less than half that. Even that may be optimistic, said Beacon's Thornberg, a lecturer in economics at the University of California at Los Angeles.

``California real estate remains in total free fall with foreclosures accelerating at a phenomenal rate in the past two quarters,'' he said. ``The real pain is just starting to come out right now, though it was imminently predictable a year ago.''

Wachovia's nonperforming assets, for which it doesn't collect interest, totaled 1.7 percent as of March 31. ``In the 1990 recession, NPAs got to 3.1 percent, so if Wachovia is one of the companies worst hit in this cycle, their nonperforming assets could more than double from here,'' said James Ellman, president of San Francisco-based Seacliff Capital LLC, which manages about $200 million.

Aside from home lending, Thompson is scaling back Wachovia's corporate and investment bank as demand for packages of home loans and other complex securities shows no sign of rebounding. Wachovia is cutting 500 jobs in the unit, bringing to more than 1,000 the number of positions eliminated since early 2007. The bank said it had 121,890 employees as of Dec. 31, 2007.

40.    As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans.  This often had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans.  In other words, many lenders became less concerned with borrowers' ability to repay over the long term and

more concerned with their mere volume of loans over the short term because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay. Consequently, as home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for these mortgages rose as well. For example, in an article titled "Tremors at the Door," published January 26, 2007 in *The New York Times*, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5% in 2006.

41.    The substantial increase in mortgage loan defaults has had a tremendous impact on the mortgage market. During the first half of 2007, many lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

42.    Although most investment banks recognized warning signs and reduced their exposure, Wachovia inexplicably chose to *increase* its entrenchment in the subprime mortgage market. On May 7, 2006, Wachovia and Golden West announced that they had entered into an Agreement and Plan of Merger, which provides, among other things, for Golden West to be merged with and into a wholly-owned subsidiary of Wachovia (the "Merger"). Wachovia acquired Golden West for $25.5 billion, a company which had substantial exposure to losses related to problems within the subprime mortgage industry.

43.    Together with its acquisition of Golden West, Wachovia itself became exposed to substantial losses, as the subprime mortgage industry suffered an immense collapse. Nonetheless, Defendants repeatedly caused to be issued inaccurate, incomplete and materially misleading statements concerning the Company's financial condition.

44.    Defendants knew or should have known that Wachovia's stock was artificially

inflated, due to: (a) the fact that the Company's acquisition of Golden West exposed the Company to tremendous losses from the meltdown of the subprime mortgage market; (b) the fact that the Company had failed to adequately and timely record accruals for losses from its exposure to delinquent subprime mortgages; and (c) the fact that the Company had far greater exposure than previously disclosed to anticipated losses and defaults in its home loan portfolio.

45.    By virtue of their positions and directors of the board of the Company, Defendants knew or should have known of the existence of the above-mentioned problems. Indeed, an article titled "Wachovia sees deal as fortification," published in *USAToday* on May 9, 2006 – two days after the acquisition of Golden West was announced – noted analysts' misgivings about the risks inherent in the deal:

> Wachovia (WB), the nation's fourth-largest bank by assets, is touting its $25.5 billion purchase of Golden West Financial (GDW) as a low-risk, high-growth strategy to expand its retail banking footprint to 21 states and mortgage-lending operations to 39 states.
>
> Some analysts and investors, though, aren't quite sold on the deal's merits. At least two analysts downgraded Wachovia's stock Monday, and investors pushed the shares down 6.7% to $55.42.
>
> The acquisition of the mortgage lender comes at a time when many real estate markets in the USA have cooled. With housing prices softening and interest rates rising, mortgage lenders such as Golden West may be at risk for losses.
>
> Over the past few years, consumers have flocked to adjustable-rate mortgages — Golden West's core business — whose rates rise with interest rates. But mortgage applications have slowed in recent months.
>
> Meanwhile, the risk of default is increasing. "Whether (the deal) is a success for Wachovia or not is going to be pretty strongly tied to what happens to the California housing market," says Brian Shullaw, a senior analyst at SNL Financial. "If default rates go up, then that's not going to be good for Wachovia."

18

But Wachovia sees the deal as a way to strengthen and diversify its business, especially outside the East and South. Wachovia would control about $669 billion in assets and $390 billion in deposits. It will rank third in market share behind JPMorgan Chase and Bank of America, says Prudential analyst Michael Mayo.

The deal is "very, very attractive" because it will allow the company to expand into high-growth areas in the West, says Ben Jenkins, Wachovia's vice chairman.

The cash-and-stock deal — expected to close in the fourth quarter — values Golden West at $81.07 a share, a 15% premium over Friday's closing price. Wachovia is exchanging 1.051 shares of its common stock and $18.65 in cash for each Golden West share.

Wachovia has bank branches in 16 states. The acquisition will broaden its presence in California, where World Savings Bank, a subsidiary of Golden West, has 123 branches and $32 billion in deposits. Wachovia will also gain its first bank branches in Arizona, Colorado, Illinois, Kansas and Nevada.

Because there's little overlap in the companies' business, Wachovia doesn't expect deep cost savings. It expects to close 55 branches and shed 1,100 employees, much of it through attrition, Jenkins says. That would leave a combined staff of 109,000 workers.

Jenkins says he's not too concerned about whether a weaker housing market will pose a risk to Wachovia, because "We are very persnickety about who we team up with." Also, Golden West has a "tight underwriting process," Jenkins says.

But the acquisition faces other challenges besides a slowing housing market. "Essentially, the concern is the integration of two very dissimilar firms" — a commercial bank and a thrift known for its mortgage-lending operations, says analyst Gary Townsend of Friedman Billings Ramsey. Townsend downgraded Wachovia's stock to a market perform, from market outperform. "We're not in love with this deal," he says.

Mayo, of Prudential, also downgraded Wachovia's stock, noting that the purchase price was "not cheap."

The deal is the latest for Wachovia. Earlier this year, it announced

19

that it would buy Emigrant Bank's American Property Financing and the retirement-plan administration business of Ameriprise Financial.

46.    Defendants knew or should have known that the Company's substantial exposure to subprime mortgage-related losses would impact the Company's stock price were the truth to became known.  For example, an article titled "Wachovia's Big Mortgage Buy," published February 20, 2008 in *Fortune*, noted that "Golden West's loans, option ARMs clustered in the frothy California real estate market, may take a hit from the housing downturn."  The article further noted the downside potential of the deal, stating in part:

> The street has never much cared for Wachovia's 2006 purchase of Golden West Financial for $24 billion. Even before the mortgage industry went splat, skeptics felt Wachovia CEO Ken Thompson was paying too much for Golden West's abundance of pay-option adjustable-rate mortgages, or option ARMs, clustered in the frothy California real estate market. Still, Herb and Marion Sandler, the husband and wife team behind Golden West, were legendary for their rigorous underwriting standards and had nimbly steered their S&L through the ugly California real estate downturn in the early '90s when other banks failed to. Now analysts and investors are wondering: Can Thompson pull off the same feat today, or is the bank in for some trouble?

47.    During the Relevant Period, the Company concealed, distorted and misrepresented its true financial condition.

48.    Indeed, Wachovia's November 8, 2007, disclosure of the Company's actual exposure to subprime mortgage-related losses was confirmed when the Company announced that it was setting aside $600 million in the fourth quarter and announced that securities linked to subprime mortgages dropped by $1.1 billion in October 2007.  This followed write-downs of $1.3 billion dollars in the third quarter.  In its press release, Wachovia stated:

> Wachovia Corporation ("Wachovia") today is providing information on the impact of market volatility on its financial results for the month of October and is providing further information on its expectation for credit costs for the fourth quarter of 2007 and certain additional information. Wachovia is providing this information in

20

advance of a presentation by a senior executive on November 9, 2007 to investors and analysts. This same information will be included in Wachovia's Third Quarter Report on Form 10-Q that will be filed on November 9, 2007:

**October Market Events** Following our October 2007 announcement of third quarter 2007 results of operations and our financial outlook for the remainder of 2007, certain financial markets experienced further deterioration, particularly the markets for subprime residential mortgage-backed securities ("RMBS") and for collateralized debt obligations ("CDOs") collateralized by RMBS ("ABS CDOs"). In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

\* \* \*

The value of CDOs we have in our portfolio depends on the value of the underlying collateral. ABS CDOs experienced declines in value correlated to the declines in value of subprime RMBS in October. Our third quarter 2007 market disruption-related losses totaling $1.3 billion pre-tax included $347 million of subprime-related valuation losses, net of hedges, on ABS CDOs. Due to the October market deterioration, these ABS CDOs experienced further declines in value in the month of October 2007 by an amount we currently estimate to be approximately $1.1 billion pre-tax. At October 31, 2007, we had remaining exposure to ABS CDOs of $676 million, including on-balance sheet positions and the notional amount of off-balance sheet positions, compared to $1.8 billion at September 30, 2007.

We have exposure to subprime RMBS in other positions totaling $2.1 billion at both October 31, 2007, and September 30, 2007. Estimated aggregate valuation losses of these other positions during the month of October 2007 are immaterial net of hedges.

\* \* \*

Of the remaining asset classes where we recorded market disruption-related losses in the third quarter of 2007, the aggregate net market value changes in October in these investments have not been significant. These asset classes include commercial mortgage,

leveraged finance, consumer mortgage, and other structured credit products not collateralized by subprime RMBS. Some of the markets for these asset classes continue to demonstrate poor liquidity and higher than typical volatility while others have displayed moderate stability in October.

The fair values of all of our assets that are subject to market valuation adjustments, including subprime RMBS and ABS CDOs, depend on market conditions and assumptions that may change over time. Accordingly, the fair values of these investments in future periods, including at the end of the fourth quarter, and their effect on our financial results, will depend on future market developments and assumptions and may be materially greater or less than the changes in values during October discussed above. For example, markets for all asset classes discussed above have remained extraordinarily volatile in the first week of November, with additional rating agencies' downgrades on subprime RMBS and ABS CDOs, and credit spread widening and illiquidity.

Wachovia has historically been a major participant in structuring and underwriting CDOs. As measured by lead underwriter league table rankings, Wachovia ranked 3rd for both the first nine months of 2007 and the full year 2006, with issuance volumes of $19.6 billion and $23.4 billion, respectively. The primary focus of Wachovia's CDO business has been, and continues to be, transactions backed by commercial loans and commercial real estate loans. Our issuance of ABS CDOs has been limited. We originated three ABS CDOs in the first nine months of 2007 and six in full year 2006, accounting for approximately 16 percent and 23 percent, respectively, of the total issuance volume of our CDO business during these periods.

Additionally, due to anticipated loan growth and the impact of continuing credit deterioration in our loan portfolio, we expect to increase our allowance for loan losses in the fourth quarter of 2007. The expected credit deterioration will likely be focused in certain geographic areas that have recently experienced dramatic declines in housing values. We expect that these declines will correlate to increases in loan losses for loans originated within the last two years within these geographic areas. Accordingly, Wachovia now expects to record a loan loss provision in the fourth quarter of 2007 by an amount estimated to be between $500 million and $600 million in excess of charge-offs for the quarter. The actual provision will be determined in accordance with our policies and procedures, will depend on credit conditions and assumptions at quarter-end and may

22

be materially greater or less than the range discussed in the preceding sentence.

49.    The *Associated Press* reported on November 9, 2007 that "[p]er Golden West, it now becomes even more obvious that Wachovia purchased the thrift at the wrong time of the cycle. ... The weakening markets - which Wachovia estimates could get worse over the last two months of the quarter - cut the value of the bank's so-called collateralized debt obligations by more than 60 percent."

50.    However, even as late as October 2007, Wachovia continued to foster a positive attitude regarding its acquisition of Golden West. On October 19, 2007, Wachovia issued a press release, announcing "Wachovia anticipates that the Golden West merger will provide Wachovia with financial benefits that include increased revenue and reduced operating expenses, but these financial benefits are not reflected in the combined illustrative information. Accordingly, the combined illustrative information does not attempt to predict or suggest future results. It also does not necessarily reflect what the historical results of the combined company would have been had our companies been combined during the periods presented."

51.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market risks that Defendants made to the market regarding Wachovia's condition did not effectively inform the investors of the past, immediate, and future dangers Wachovia was facing.

52.    An adequate investigation by Defendants would have revealed the Company's substantial, undisclosed exposure to subprime mortgage-related losses. A reasonably prudent fiduciary acting under similar circumstances would have acted to protect the Company against

unnecessary losses.

53.    Because Defendants knew or should have known that Wachovia was not as healthy as represented, they had an obligation to protect the Company from unreasonable and entirely predictable losses incurred as a result of the Company's subprime exposure.

54.    Upon information and belief, Wachovia and certain other Defendants regularly communicated with shareholders about the performance, future financial and business prospects of the Company.  During the Relevant Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, by not disclosing negative material information concerning investment in the Company's stock.  As such, investors could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments.

55.    Relevant SEC filings and related Company statements and releases issued during the Relevant Period were inaccurate, incomplete and materially misleading, causing Wachovia stock to be artificially inflated.  These statements, their related press releases, and substantially similar SEC filings and press releases issued during the Relevant Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the market of the Company's ever-increasing problems with its key product lines, including loan defaults, liquidity concerns and shrinking demand.  These statements were made with the implicit knowledge that the market would rely upon such information in determining whether to purchase or maintain investments in Wachovia stock.

## THE DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

56.    Through their positions as directors and/or officers of the Company and their receipt

24

of reports, attendance at meetings, and access to all of the Company's books, records and other proprietary information, each of the Defendants knew that Wachovia had engaged in the unlawful and imprudent conduct described herein.

57.    Each of the Defendants breached their fiduciary duties of loyalty, good faith, and due care by knowingly causing or allowing the Company to engage in the unlawful and imprudent conduct described herein.

58.    As a direct and proximate result of Defendants' breaches of fiduciary duties, Wachovia has suffered enormous damages, including, but not limited to, damages associated with numerous lawsuits and investigations of the Company, as alleged herein.

## DERIVATIVE ALLEGATIONS

59.    Plaintiff brings this action derivatively in the right and for the benefit of Wachovia, to redress injuries suffered and to be suffered by the Company as a direct result of the violations of law, breaches of fiduciary duty and other wrongdoing described in this complaint, committed by Defendants and alleged in detail herein.  Wachovia is named as a nominal defendant solely in a derivative capacity.

60.    Plaintiff will adequately and fairly represent the interests of Wachovia and its shareholders in enforcing and prosecuting their rights.

61.    Wachovia's Board of Directors is currently composed of sixteen directors – Defendants Shaw, Browning, Ingram, McDonald, Proctor, Baker, Casteen, Gitt, Goodwin, Herringer, James, Neubauer, Rady, Richey, Smith and Young (the "Current Board").  Each of these directors has been named as a defendant in this action.

62.    The Current Board owed a duty to Wachovia and its shareholders to be reasonably

informed about the business and operations of the Company. The Current Board completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

63.    Demand on the Current Board to institute this action is would be a futile and useless act, for the additional following reasons:

a.    Members of the Current Board participated in, approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from Wachovia stockholders and investors and are, therefore, not disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

b.    Members of the Current Board had a responsibility and obligation to assure that all press releases and filings, including all financial reports, were accurate and that all internal controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

c.    In order to bring this suit, members of the Current Board would be forced to sue themselves and/or persons with whom they have extensive business and/or personal entanglements, which they will not do;

d.    The acts complained herein of constitute violations of federal and state law and the fiduciary duties owed by members of the Current Board and are incapable of ratification;

e.    Certain members of the Current Board herein are currently defendants in a

securities class action lawsuit arising out of the wrongdoing alleged herein and a suit by them to remedy the wrongs alleged herein would likely expose them to liability in the securities class action; thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves and the other Defendants;

f.    The actions of Defendants have impaired the Current Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

g.    The misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment;

h.    Wachovia has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Current Board has not filed any lawsuits against themselves or others who were responsible for that wrongful course of conduct, nor have they attempted to recover any part of the damages Wachovia suffered and will suffer thereby; and

i.    Accordingly, members of the Current Board are personally and directly conflicted and committed to the unlawful course of conduct in dispute and, therefore, cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

64.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

27

65.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

66.     Defendants each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

67.     Each of the Defendants authorized, or by abdication of duty, each of the Defendants participated in, approved or recklessly disregarded the wrongs complained of herein.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

68.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to the Company's reputation, business and good will.

69.     The Company has been directly and substantially injured by reason of Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

C.    Awarding punitive damages against Defendants, jointly and severally, to be determined at trial, together with prejudgment interest at the maximum rate allowable by law; and

D.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by jury.

Dated: August 5, 2008                              **MURRAY, FRANK & SAILER LLP**

_____S_____
                              Brian P. Murray (BM 9954)
                              Gregory B. Linkh (GL 0477)
                              275 Madison Avenue, Suite 801
                              New York, New York 10016
                              Telephone: (212) 682-1818
                              Facsimile: (212) 682-1892

                              Howard G. Smith
                              **LAW OFFICES OF HOWARD G. SMITH**
                              3070 Bristol Pike, Suite 112
                              Bensalem, PA 19020
                              Telephone: (215) 638-4847
                              Facsimile: (215) 638-4867

                              **Plaintiff's Counsel**

**VERIFICATION**

We, Robert Romain and Cynthia Flory, as trustees of the Estate of Joseph Romain, on behalf of the Estate of Joseph Romain, hereby declare as follows:

The Estate of Joseph Romain is the Plaintiff in the above captioned case. We have read the foregoing Derivative Action Complaint and authorized its filing. Based upon the investigation of our counsel, the allegations in the Complaint are true to the best of our knowledge, information and belief.

7/29/08
Dated

Robert Romain

7/29/08
Dated

Cynthia Flory